IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DEBRA M. CONLEY                    )
                                   )
v.                                 )        No. 3:07-1080
                                   )        Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION     )


To:     The Honorable John T. Nixon, Senior Judge


<u>REPORT AND RECOMMENDATION</u>

        This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration"), through its Commissioner, denying plaintiff's applications for

disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits, as

provided under Titles II and XVI of the Social Security Act ("the Act"). The case is currently

pending on plaintiff's motion for judgment on the administrative record (Docket Entry No.

16), to which defendant has responded (Docket Entry No. 22); plaintiff has further filed a

reply (Docket Entry No. 23) to defendant's response. Upon consideration of these papers and

the transcript of the administrative record (Docket Entry No. 13; referred to hereinafter as

"Tr."), and for the reasons given below, the undersigned recommends that plaintiff's motion

be **GRANTED**, and that defendant's decision be **REVERSED** and the cause **REMANDED** for

further administrative proceedings consistent with this report, to include rehearing.

1

# I. Procedural History

The tortured history of plaintiff's disability claims is well summarized in plaintiff's brief (Docket Entry No. 17 at 1-3), as follows:

With a filing month of January 2000, Conley applied for DIB, stating that she had been disabled since March 1, 1995. (Tr. 103) After this application was denied initially and on reconsideration, she requested a *de novo* ALJ hearing. (Tr. 74, 80, 82) On October 3, 2001, Conley appeared with counsel and testified at an administrative hearing before ALJ Peter C. Edison.[1] (Tr. 59) In addition, a vocational expert testified. (Tr. 59) On November 7, 2001, ALJ Edison decided that Conley was not disabled at step five. (Tr. 67-68) 20 C.F.R. § 404.1520(g) (2007) (step five). On February 21, 2002, the Appeals Council granted Conley's request for review and remanded her claim to an ALJ for readjudication. (Tr. 94-98)

On June 18, 2002, Conley appeared with counsel at a supplemental hearing before ALJ Edison.[2] (Tr. 341) On August 15, 2002, ALJ Edison decided that Conley was not disabled at step five. (Tr. 349-50) Conley requested Appeals Council review. In April 2003, i.e., when her request for review was pending at the Appeals Council, she reapplied for DIB and applied for SSI.[3] (Tr. 418)

On April 11, 2005, the Appeals Council granted Conley's request for review, remanded her 2000 application for readjudication, and instructed the ALJ on remand to consolidate her 2003 applications with her 2000 application. (Tr. 357-62) On September 6,

---

[1]The transcript of the October 2001 hearing is not included in the administrative record.

[2]The transcript of the June 2002 hearing is not included in the administrative record; it was lost. (Tr. 360)

[3]Conley's 2003 applications are not included in the administrative record.

2

2006, Conley appeared with counsel and testified at an administrative hearing before ALJ

William Taylor. (Tr. 793) In addition, Gary Sturgill testified as a vocational expert. (Tr.

793-95, 803-05) On January 11, 2007, ALJ Taylor decided that Conley was not disabled at

step five prior to February 1, 2006 and disabled at step three since that date.[4] (Tr. 32-34) 20

C.F.R. § 404.1520(d) (2007) (step three); 20 C.F.R. § 404.1520(g) (2007) (step five). ALJ

Taylor thus rendered a partially favorable decision. Because Conley was not disabled as of

her date last insured (December 31, 2003), she was not entitled to DIB. (Tr. 32-34) On

August 16, 2007, ALJ Taylor's decision became the final decision of the Commissioner when

the Appeals Council denied Conley's request for review. (Tr. 6) 20 C.F.R. § 422.210(a)

(2007). Pursuant to 42 U.S.C. § 405(g), Conley then initiated this civil action.

The enumerated findings of the decision under review here are as follows:

1.      The claimant last met the insured status requirements of the Social Security
        Act on December 31, 2003.

2.      The claimant has not engaged in substantial gainful activity since March 1,
        1995, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b)
        and 416.971 *et seq.*).

3.      Since the alleged onset date of disability, the claimant has had the following
        severe impairment: chronic obstructive pulmonary disease (20 CFR
        404.1520(c) and 416.920(c)).

4.      Prior to February 1, 2006, the claimant did not have an impairment or
        combination of impairments that met or medically equaled an impairment
        listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and
        416.920(d)).

5.      Prior to February 1, 2006, the claimant had the residual functional capacity to
        lift and/or carry 10 pounds frequently and occasionally; stand and/or walk

---

[4]20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A, § 3.02(A) (2007).

about 4 hours in an 8 hour workday for 1 hour at a time; sit for a total of about 6 hours in an 8 hour workday; occasionally reach; avoid pulmonary irritants on a regular basis; and no job requiring driving.

6.      The claimant is unable to perform past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on October 5, 1961, and was 33 years old, on March 1, 1995, which is defined as a younger individual aged 18-44.  As of October 5, 2006, the claimant was 45 years old, which is defined as a younger individual aged 45 to 49 (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited, eighth grade education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Prior to February 1, 2006, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Prior to February 1, 2006, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.     Beginning on February 1, 2006, the severity of the claimant's chronic obstructive pulmonary disease has met the requirements of section(s) 3.02A of Appendix 1.

12.     The claimant was not disabled prior to February 1, 2006 (20 CFR 404.1520(g) and 416.920(g)), but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 416.920(d)).

(Tr. 21-22, 32-34)

## II.  Review of the Record

4

Neither party having endeavored to summarize the proof in this case, the following review is taken from the decision of the ALJ (Tr. 23-28):

The claimant experienced 3 episodes of recurrent left pneumothorax in early 1993 that resolved with treatment (Exhibits 1F, 2F, and 3F).

There was inpatient hospitalization March 6, 1995 to March 23, 1995, due to obsessive compulsive behaviors, as well as issues related to grief, co-dependency, and passivity. The claimant reported stress secondary to the death of her alcoholic abusive husband in a trailer fire in November 1994. She was separated from him at the time. Testing and interviews supported diagnoses of a bipolar disorder and an anxiety disorder with obsessive-compulsive disorder, panic disorder, and a dependent/compulsive personality disorder with avoidant traits (Exhibit 4F).

There was an emergency room visit October 3, 1997, for abdominal pain. Sterilization was performed in March 1998. There was an emergency room visit August 22, 1998, for treatment of a vaginal infection and contact dermatitis. Dr. Hawkins performed a normal annual gynecological evaluation in December 1998. Dr. York excised a cyst on the left breast in 2000 (Exhibits 5F, 6F, 7F, 13F and 18F).

A consultative mental status evaluation was performed by Elliott Ward, Ph.D., on February 29, 2000, with diagnoses of bipolar disorder, depressed, in fair remission; panic disorder without agoraphobia, in fair remission; obsessive-compulsive disorder, in fair remission; and mild mental retardation. The claimant reported that she dropped out of school when she got married at age 15. She had received mental health treatment and medications were effective in managing symptoms related to depression, panic attacks, and obsessive behaviors. The claimant was able to clean the house, do laundry, cook, and make

5

sure her 15-year-old son went to school. She visited with her grandchildren and went to the store. The claimant obtained a full scale IQ score of 68, verbal IQ score of 67, and performance IQ score of 75. Working memory and concentration were good. Reading was at the third grade level with math at the fourth grade level. The claimant was capable of understanding and remembering basic instructions; maintaining concentration and persistence; relating to coworkers and supervisors; and making basic adaptations (Exhibit 9F).

There was an emergency room visit September 19, 2000, for a cough due to bronchitis. The claimant was advised to stop smoking (Exhibit 22F).

The claimant dislocated her left shoulder in April 2001. Left shoulder anterior capsulorraphy with labral repair was performed July 31, 2001. In follow-up with Thomas Limbird, M.D., the claimant was progressing very well. In September 2001, Dr. Limbird released the claimant to return to work with no lifting, pushing, or pulling greater than 5 pounds with the left arm (Exhibits 20F, 23F, and 24F).

Glenn Eisen, M.D., evaluated the claimant on February 20, 2001, for gastroesophageal reflux disease. The claimant reported that asthma was under pretty good control. Lungs were clear. In follow-up, she was asymptomatic with Protonix. When next seen on October 1, 2002, the claimant was asymptomatic with medication. Chest was clear bilaterally. It was emphasized that the claimant needed to lose weight and cut back on her tobacco use (Exhibits 16F and 27F).

A consultative psychological evaluation was performed by Kathryn Sherrod, Ph.D., on April 17, 2002, with diagnoses of obsessive-compulsive disorder; bipolar disorder, most recent episode mixed, moderate; and borderline intellectual functioning. The claimant

6

reported that she had not been in any special education classes while at school. She cleaned apartments in her complex when needed, walked, checked the mail, talked to the neighbors she trusted, prepared supper, washed dishes, washed clothes, and swept. The claimant attended church weekly. She enjoyed shopping and doing crafts with a neighbor. She depended on friends for transportation. The claimant obtained a full scale IQ score of 70, verbal IQ score of 70, and performance IQ score of 75. Given her frustration and tendency to give up on more difficult tasks, the test results were likely an underestimate of functioning. The claimant preferred to work with the examiner instead of independently, but comprehended all instructions without difficulty. Claimant did well in structured or calm situations, but she overreacted to pressure or stress and was compulsive about cleaning her home. The Global Assessment of Functioning score was 50. The claimant's ability to understand and remember was not significantly limited. Her ability to sustain concentration was variable. Social skills were adequate. She was driven by her compulsions and lacked good enough judgment to avoid giving in to her compulsions. There were moderate (still able to function satisfactorily) limitations in the ability to make judgments on simple work-related decisions and respond appropriately to work pressures in a usual work setting. There were no limitations in the ability to understand, remember, and carry out short, simple instructions with slight (can generally function well) limitations in the ability to understand, remember, and carry out detailed instructions. There were slight limitations in the ability to interact appropriately with the public, supervisors, and coworkers and respond appropriately to changes in a routine work setting (Exhibit 25F).

Records from ProHealth Medical Center, Dr. Sidberry and Dr. Turner, dated September 1999 to May 2003, show treatment for seasonal allergies, asthmatic bronchitis,

7

upper respiratory infection, sinusitis, boils, dysmenorrhea, gastroesophageal reflux disease, and a thyroid nodule. It was noted that the claimant had depression. The claimant was smoking approximately 1 ½ packs of cigarettes a day and was advised to decrease smoking. Lungs were generally clear (Exhibits 8F, 19F, and 29F).

A consultative psychological evaluation with clinical interview and mental status examination was performed by James Proffitt, M.S., on July 14, 2003, with diagnoses of bipolar disorder not otherwise specified; obsessive-compulsive disorder; and panic disorder not otherwise specified. The claimant lived with her son. She reported that on days that she felt better she cleaned house and did laundry and was able to do her own grocery shopping. She also cared for her dogs. The claimant did not socialize with others and had stopped attending church. Memory was intact. Concentration was normal. Intellectual functioning was estimated to be in the low average range. A significant impairment existed in the ability to relate. The ability to understand, remember, and carry out short, simple and detailed instructions was not impaired. The ability to make judgments on simple work-related decisions was not impaired. Cognitive skills were intact. There was a moderate impairment in the ability to interact appropriately with the public, supervisors, and coworkers; and respond appropriately to work pressures in a usual work setting. There was a mild impairment in the ability to respond appropriately to changes in a routine work setting. The current Global Assessment of Functioning score was 50 with the highest Global Assessment of Functioning score in the past year at 65 (Exhibit 30F).

A consultative pulmonary function study was performed by Grafton Thurman, M.D., on July 29, 2003. The pulmonary function studies showed chronic obstructive pulmonary disease. There was sufficient pulmonary reserve for light physical activity which

included the ability to occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand/walk for a total of about 6 hours in an 8-hour workday; and sit for a total of about 6 hours in an 8-hour workday (Exhibit 31F).

Babu Rao, M.D., examined the claimant on September 30, 2003, with diagnosis of gastroesophageal reflux disease.  The chest was clear.  Dr. Rao prescribed Reglan in addition to Protonix (Exhibit 34F).

There was an emergency room visit October 10, 2003, for an acute exacerbation of chronic obstructive pulmonary disease.  A comprehensive review of systems was essentially negative.  Lungs were clear with no wheezes.  Oxygen on room air was within normal limits.  Chest x-ray showed no active disease.  There was marked improvement with Albuterol treatment and prednisone (Exhibit 35F).

Records from Yoga Thati, M.D. are dated September 12, 2003, to March 3, 2005, with treatment for thyroid nodule, boils, chronic obstructive pulmonary disease/asthma, sinusitis, upper respiratory infection, and gastroesophageal reflux disease.  It was noted that the claimant had a diagnosis of bipolar disorder.  A thyroid lobectomy was performed in November 2003.  Chest x-ray in October 2003 was normal with clear lung fields.  Chronic obstructive pulmonary disease/asthma was stable.  As a result of an abnormal chest x-ray in December 2004 showing questionable soft tissue density overlying the right lung apex, a chest CT scan was performed in January 2005 that showed calcific changes compatible with old granulomatous disease and no other significant abnormalities.  At followup visits, chest and lungs were found to be clear.  In a child care provider's medical report dated April 28, 2005, Dr. Thati stated that the claimant was able to lift 40 pounds, had the agility to move quickly to keep pace with toddlers, had the stamina to remain alert and

9

energetic for 8 hours or more; the claimant did not have any condition which required restriction of activity or which could affect temperament and interaction with children; with no physical, mental, or emotional limitation affecting the ability to care for a group of children; was not taking any medications which could affect work or interaction with children; and was physically, mentally, and emotionally capable in all respects of safely and appropriately providing transportation for children (Exhibit 37F).

   Dr. Sherrod performed another consultative psychological evaluation on August 16, 2005, with diagnoses of dysthymic disorder and borderline intellectual functioning. The claimant was able to fill out paperwork. She reported that she quit school in the eighth grade to get married and because she did not want to ride a bus 30 to 40 minutes to and from school. The claimant had never obtained a driver's license and relied on others for transportation. The claimant lived with a friend, his daughter, and her 21 year old son. She did all the housework for the household including cleaning, laundry, and cooking, in return for living there. She liked to watch television and listen to music. She was able to go to the grocery store. Sometimes she walked two dogs that belonged to her friend's daughter. The claimant was able to complete all her own self-care activities. Three to four times a week she was able to work in the yard to keep the flowers and yard looking good. She quit going to church when she moved in with her friend fearing that people at church were judging her. Her behavior during the examination did not indicate any obsessive-compulsive characteristics or pattern. The claimant obtained a full scale IQ score of 69, verbal IQ score of 72, and performance IQ score of 70. These scores were considered to be a slight underestimate given the claimant's tendency to say she did not know information when she did know it. The claimant did not appear to be mentally retarded but rather

10

functioning in the borderline range of intelligence. Reading was at the fourth grade level, spelling abilities were at the fifth grade level, and arithmetic ability was at the fourth grade level. There was adequate visual/motor/spatial coordination. She had good organizational skills. Her mental health diagnoses were not substantiated by her functioning at the time of this evaluation. The claimant did not provide a description of her "bipolar" symptoms that sounded like bipolar disorder. She did not mention having panic disorder and did not appear especially anxious during the evaluation. No symptoms of obsessive-compulsive disorder were observed. The claimant had a raspy voice but did not appear breathless at any point during the evaluation. The claimant was able to understand and follow instructions adequately. She was able to comprehend directions for tests. Concentration was adequate. The claimant was able to work persistently through the evaluation without requiring any breaks. She reported that she could deal with people in grocery stores and in the home. The current Global Assessment of Functioning score was 65. There were none to slight (generally able to function well) limitations in all areas of mental functioning (Exhibit 39F).

Records from the Williamson County Health Department, Dr. Finney, are dated September 9, 2005, to January 18, 2006, with treatment for asthmatic bronchitis, chronic obstructive pulmonary disease, hypertension, tobacco abuse, and anxiety. Chest x-ray dated November 7, 2005, was clear. Oxygen saturations were 92 to 93. The claimant repeatedly requested Klonopin but was advised to talk to personnel at the mental health center regarding this prescription. The claimant was notified numerous times to pick up Spiriva but she never did (Exhibits 42F and 44F).

Records from Salim Mihyu, M.D., a pulmonary disease specialist, are dated February 8, 2003, to February 7, 2006, and show evaluation of persistent asthma. It was

11

noted that the claimant was a chronic heavy smoker, one pack daily for 20 years and continuing. Diagnoses were persistent moderate asthma, bronchitic, rhinitis, smoking addiction, and gastroesophageal reflux disease. A pulmonary function study dated February 28, 2003, showed an FEV1 of 1.04 liters at 31 percent of predicted compatible with severe chronic obstructive pulmonary disease. There was a significant response to bronchodilators. The claimant was strongly cautioned and advised to abstain from smoking as it was very likely that it would make the treatment of her asthma quite refractory and difficult to achieve. At a follow-up visit on March 7, 2003, there was a 90 percent improvement with significant improvement in shortness of breath and almost resolved cough. Pulse oxygen on room air was 95 percent. In follow-up visits, the claimant was repeatedly advised to quit smoking in order to protect her remaining lung capacity. She was given a prescription for Nicotrol inhaler to assist in abstaining from cigarette smoking. Dr. Mihyu referred to another pulmonary function test dated December 5, 2003, that showed severe obstructive lung disease with severe air trapping with lung capacity showing an FEV1 of 0.98 liters at 31 percent of predicted indicating severe obstructive lung disease. However, this report was not in his records. The claimant was informed in January 2004 that her lung capacity was expected to continue to deteriorate to the point of making her completely disabled from a respiratory standpoint within 2-3 years at the most, especially if she were to continue to smoke at her current pace. The claimant was again counseled to quit smoking completely and was given a prescription for Nicoderm CQ to assist in the process. The claimant was seen in follow-up with episodes of bronchitis and rhinitis as well as for refills of medication. Examinations showed mild wheezing. In 2005, the claimant requested Lortab for musculoskeletal chest pain. In a letter dated February 1, 2006, Dr. Mihyu gave a diagnosis of

12

severe chronic obstructive pulmonary disease with asthma and emphysema treated with multiple inhalers. However, the claimant continued to smoke despite advice to the contrary. Dr. Mihyu stated that in view of the claimant's lung disease she was considered to be disabled from a respiratory standpoint based on severe disabling lung disease. Prognosis was guarded and life expectancy was considered to be limited due to severe disabling lung disease (Exhibits 36F and 43F).

A consultative examination was performed by Bruce Davis, M.D., on March 13, 2006, with diagnoses of obesity, allergic rhinitis, cigarette associated obstructive lung disease, hypertension, bilateral rotator cuff injuries status post left repair, anxiety/depression. Although the claimant used oral and inhaler bronchodilators and a nebulizer she continued to smoke cigarettes. Claimant weighed 201 pounds at a height of 5 feet 4 inches. Blood pressure was 130/90. There were shallow breath sounds with expiratory wheeze. There was bilateral shoulder pain with reduced range of motion. There was normal elbow, wrist, finger motion/dexterity and good grip. Gait maneuvers were normal. Chest x-ray showed clear lung fields. Pulmonary function study showed severe obstruction with vital capacity 2.07 FEV1/FVC 51 percent pre-bronchodilators and 57 percent post-bronchodilators. Dr. Davis gave limitations of lift/carry 10 pounds occasionally and frequently; stand/walk about 4 hours in an 8-hour workday for less than 1 hour uninterrupted; sit about 6 hours in an 8-hour workday; limited ability to push/pull with the upper extremities; occasionally climb, balance, kneel, crouch, stoop; never crawl; occasionally reach; avoid exposure to temperature extremes, noise, dust, vibration, humidity/wetness, fumes, odors, chemicals, gases, hazardous machinery, and unprotected heights (Exhibit 40F).

Records from The Guidance Center (Volunteer Behavioral Health Care

13

System), Renee Glenn, M.D., are dated July 15, 1998, to September 2004; and then November 2005 to August 2006, with diagnoses of obsessive-compulsive disorder and anxiety disorder. Claimant's stressors included her son's legal problems and behavior as well as lack of finances. Claimant's symptoms were stable with medication. There were episodes of increased symptoms in response to increased stress. Panic attacks occurred occasionally. Global Assessment of Functioning (GAF) scores in March 2000 were 70 to 75. As of March 2001, the claimant reported that she stayed busy, was active, had good energy and interest with occasional varying degrees of anxiety yet overall doing quite well. Dr. Glenn, a psychiatrist, gave no limitations in the ability to understand, remember, and carry out short, simple instructions; moderate (still able to function satisfactorily) limitations in the ability to understand, remember, and carry out detailed instructions; make judgments on simple work-related decisions; interact appropriately with supervisors and coworkers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting; with slight (can generally function well) limitation in the ability to interact appropriately with the public. There was a lack of case management services from December 2001 with case management services terminated in March 2002 due to lack of contact. The next case management contact was in October 2003 at which time mood was normal with feelings of depression and anxiety typically. Claimant cancelled follow-up case management appointments. The claimant next contacted the mental health facility in November 2005 stating she discontinued services after her medical provider left and she was dissatisfied with the nurse practitioner. The claimant requested continuance of her medication regimen that included Prozac and Klonopin. She reported that symptoms seemed to be under good control with these medications. Diagnoses at this time were post-

14

traumatic stress disorder, chronic with panic/anxiety/depression/mood swings/obsessive compulsive disorder traits; and mood disorder due to general medical condition with mixed features. Lack of income and independence due to having to rely on a friend for housing and her family for financial assistance contributed to depression and anxiety. Claimant tended to obsess with cleanliness when stressed to the point of having difficulty focusing on other obligations. She had minimal social support and was unhappy with her living arrangements. Racing thoughts interfered with the ability to focus. Stress exacerbated obsessions and compulsions, and increased panic attacks and anxiety without medication. Claimant had conflicts with her roommate, daughter, and son. In December 2005, the claimant reported that she volunteered to work at her daughter's daycare. She noted that she worried less when she stayed busy and kept her mind focused on other things. There was good control of symptoms with medication with anxiety controlled with Klonopin. As of July 2006, claimant was stable with therapy and medications. GAF/CRG score was 52 currently, 55 highest and 50 lowest (Exhibits 12F, 17F, 26F, 28F, 41F, and 45F).

The claimant testified at the hearing that she was unable to work due to breathing difficulties. There was constant shortness of breath that continued to worsen. Treatment included medications, inhalers, and a nebulizer. The claimant continued to smoke a pack of cigarettes a day. The doctor told her to stop smoking or she would get worse and that stopping smoking might improve or stabilize her condition. The claimant also had depression for which she received treatment and medication. Prozac and Klonopin helped depression sometimes. Side effects of medication included sleepiness. There were no other impairments other than depression and breathing difficulties with the breathing condition more severe than the depression. When she felt like it the claimant was able to clean, cook,

15

and do laundry.  She watched television and visited with her daughter and grandchildren.
She could not breathe around cleaning chemicals.  The claimant had never obtained a
driver's license.

### III.  Conclusions of Law

#### A.  Standard of Review

This court reviews the final decision of the SSA to determine whether that
agency's findings of fact are supported by substantial evidence in the record and whether the
correct legal standards were applied.  <u>Elam ex rel. Golay v. Comm'r of Soc. Sec.</u>, 348 F.3d
124, 125 (6th Cir. 2003).  "Substantial evidence is defined as 'more than a scintilla of evidence
but less than a preponderance; it is such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion.'"  <u>Rogers v. Comm'r of Soc. Sec.</u>, 486 F.3d 234, 241 (6th
Cir. 2007)(quoting <u>Cutlip v. Sec'y of Health & Human Servs.</u>, 25 F.3d 284, 286 (6th Cir.
1994)).  Even if the evidence could also support a different conclusion, the SSA's decision
must stand if substantial evidence supports the conclusion reached.  <u>Her v. Comm'r of Soc.
Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999).

#### B.  Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits
by proving his or her "inability to engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a continuous period of not less than
12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's "physical or mental impairment" must
"result[] from anatomical, physiological, or psychological abnormalities which are

16

demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at §

423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step

sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found
> to be disabled regardless of medical findings.

> 2) A claimant who does not have a severe impairment will not be found to be
> disabled.

> 3) A finding of disability will be made without consideration of vocational
> factors, if a claimant is not working and is suffering from a severe impairment
> which meets the duration requirement and which meets or equals a listed
> impairment in Appendix 1 to Subpart P of the Regulations. Claimants with
> lesser impairments proceed to step four.

> 4) A claimant who can perform work that he has done in the past will not be
> found to be disabled.

> 5) If a claimant cannot perform his past work, other factors including age,
> education, past work experience and residual functional capacity must be
> considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r

of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f),

416.920 (b)-(f).

　　　　　The SSA's burden at the fifth step of the evaluation process can be carried by

relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the

claimant is not significantly limited by a nonexertional impairment, and then only when the

claimant's characteristics identically match the characteristics of the applicable grid rule. See

Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be

used to direct a conclusion, but only as a guide to the disability determination. Id.; see also

Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not

direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony.  See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

## C.  Plaintiff's Statement of Errors

Plaintiff argues that the ALJ's determination that she was not disabled prior to February 1, 2006, is undermined by the following errors:  (1) the failure to properly determine plaintiff's educational level by reference to her performance on achievement testing, rather than by rote application of the highest grade level she completed in school; (2) the failure to find any severe mental impairment associated with plaintiff's reduced intellectual functioning; (3) the failure to square the hearing testimony of the vocational expert with the Dictionary of Occupational Titles ("DOT"), pursuant to the obligation imposed by Social Security Ruling 00-4p; and (4) the failure to give any explanation for rejecting certain portions of the assessment of the examining consultant, Dr. Davis, when that assessment was lauded as "comprehensive," "consistent with the record as a whole," and due "significant weight."  (Tr. 31)  For the reasons given below, the undersigned finds error

18

in the ALJ's handling of the vocational issues in this case, and therefore would recommend reversal and remand of the administrative decision.

Regarding the finding that plaintiff's completion of the eighth grade provided her a "limited" education under the regulations,[5] it is clear that this result is only proper if there is no more particular evidence of plaintiff's aptitudes which would contradict the presumption that her eight years of formal schooling equated with an eighth grade education. See 20 C.F.R. § 404.1564(b) ("[I]f there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities."). As defendant effectively concedes in its brief, such contradictory evidence in the form of plaintiff's scores on achievement testing -- showing that plaintiff reads, spells, and performs calculations at or below the fifth grade level (Tr. 211, 599) -- should have led the ALJ to classify plaintiff's educational level as "marginal" under the regulations.[6] However, the undersigned agrees with defendant that this error was cured when the ALJ instructed the vocational expert to

_____

[5]The regulations define "limited" education as follows:

Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

20 C.F.R. § 404.1564(b)(3).

[6]The regulations define "marginal" education as follows:

Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.

20 C.F.R. § 404.1564(b)(2).

19

assume "an eighth grade education [with] the ability to read and write simple things, the ability to perform simple math such as adding and subtracting."  (Tr. 803)  This further qualification of plaintiff's eighth grade educational level is functionally equivalent to instructing the expert to assume the "ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs," i.e., a marginal education.  20 C.F.R. § 404.1564(b)(2).  Accordingly, the ALJ's error in finding that plaintiff has a limited education (Tr. 32) is rendered harmless.  See Collier v. Comm'r of Soc. Sec., 108 Fed.Appx. 358, 362 n.1 (6th Cir. Aug. 24, 2004)(finding error in determination of educational level rendered harmless by hypothetical question to expert indicating claimant's illiteracy).

Unfortunately, as conceded by defendant, the vocational expert's testimony in response to the ALJ's questioning appears to be flawed, or at least potentially flawed, as four of the six jobs identified therein are in fact semi-skilled according to the Dictionary of Occupational Titles ("DOT"), and thus presumed by the regulations to be incompatible with even limited (much less marginal) educational abilities.  As explained in the agency's own ruling, this unresolved conflict between the expert testimony and the DOT flatly precludes reliance on the expert:

> When vocational evidence provided by a VE [(vocational expert)] or VS [(vocational specialist)] is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled.  The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

Soc. Sec. Rul. 00-4p, 2000 WL 1898704, at *4 (S.S.A.).  This ruling further instructs that

20

agency adjudicators have "an affirmative responsibility to ask about any possible conflict between [the] VE or VS evidence and information provided in the DOT." Id. The hearing transcript in this case reveals that the ALJ failed to fulfill this affirmative responsibility, and compounded the error by misrepresenting in his decision that, "[p]ursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the [DOT]." (Tr. 33)

Defendant nevertheless argues that one of the jobs identified by the expert, that of counter clerk, is identified by the DOT as an unskilled position, and is otherwise compatible with plaintiff's physical limitations as determined by the ALJ. In advancing this argument in support of the ALJ's step five finding, defendant would have this court make a finding of substantial evidence based on the shred of expert testimony which is *not* contradicted by the DOT, though even the identification of the counter clerk position comes with the caveat that the DOT lists this position as light work, while the expert testified that it is in the "low range of light ... I think ... permit[ting] that 10-pound lifting" restriction assigned to plaintiff. (Tr. 804) Finally, defendant proclaims it incontrovertible that the numbers of counter clerk positions (1,200 in the state economy and 60,000 in the national economy) identified by the vocational expert are "significant" for purposes of the government's burden at step five, citing Harmon v. Apfel, 168 F.3d 289, 292 (6th Cir. 1999).

With all due respect, the undersigned finds that the expert testimony in this case is simply unreliable, consistent with the above-quoted provisions of SSR 00-4p. Moreover, the ALJ's error in failing to properly vet the expert's testimony may not be salvaged by a post-decision comparison -- outside the record -- with the DOT. Prochaska v.

21

Barnhart, 454 F.3d 731, 735-36 (7th Cir. 2006). Nor would it be proper for this court in the first instance to find "significant" the numbers of jobs identified in that testimony which survived comparison with the DOT. Rather, the errors identified here require a remand for purposes of reconsidering the vocational issues in this case.

Regarding plaintiff's mental impairment and the severity of any limitations stemming from such impairment, plaintiff's argument is solely based on her borderline intellectual functioning, and not any emotional disturbance recognized in past mental evaluations or the prior ALJ decisions, such as obsessive-compulsive disorder and anxiety/panic disorder; the ALJ's conclusion that such conditions were generally well controlled by medication and therapy (Tr. 29-30) is thus unchallenged. As to plaintiff's cognitive impairment, the record reveals that, upon administration of the Wechsler Adult Intelligence Scale, plaintiff's intellectual abilities have been interpreted fairly consistently as falling within the borderline range of functioning, reaching the low average range at best. In considering plaintiff's intellectual deficits, the ALJ observed that "[t]he best indicator of severity is the level of adaptive functioning and how claimant performs activities of daily living" (Tr. 30-31), and then proceeded to find that the record as a whole did not support any significant limitation in plaintiff's adaptive or cognitive ability to perform jobs at the unskilled entry level (Tr. 31). While there is room for disagreement as to whether or not plaintiff's medically determinable intellectual and emotional impairments were properly deemed nonsevere,[7] it cannot be said that the finding of nonseverity amounts to prejudicial

---

[7]"Step two has been described as a '*de minimis* hurdle'; that is, 'an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 243 n.2 (6th Cir.

22

error, as the sequential evaluation process continued past step two upon a finding of medically severe COPD, and plaintiff's subaverage intellectual functioning was duly considered at the fourth and fifth steps of the process alongside her other mental and physical impairments.  See Fisk v. Astrue, 253 Fed.Appx. 580, 583-84 (6th Cir. Nov. 9, 2007); Maziarz v. Sec'y of Health & Humans Servs., 837 F.2d 240, 244 (6th Cir. 1987); see also James v. Sec'y of Health & Human Servs., 1994 WL 112879, at *2 (6th Cir. Apr. 1, 1994)("Thus, the ALJ properly considered the impact of plaintiff's [borderline] intelligence and illiteracy on a daily basis by ruling that plaintiff is limited to simple, unskilled entry-level tasks.").

However, the conclusion drawn from the ALJ's consideration of plaintiff's intellectual impairment -- "that although the claimant may be a little slower than average in learning new information and skills she has the adaptive and cognitive ability to perform jobs at the unskilled entry level" (Tr. 31) -- represents a finding of her functional limitation to unskilled, entry-level work on account of her mental impairment.  The ALJ confirmed this limitation when he accorded "significant weight" to the assessment of treating psychiatrist Dr. Glenn, whose opinion that plaintiff was moderately limited in several

---

2007)(quoting Higgs v. Bowen, 880 F.2d 860, 862 (6th Cir. 1988)); Soc. Sec. Rul. 85-28, 1985 WL 56856 (S.S.A.).  The regulations define a severe impairment as one which significantly impacts the ability to perform basic work activities.  20 C.F.R. §§ 404.1520(c), 404.1521(a).  Such basic work activities include, *inter alia*, understanding, carrying out, and remembering simple instructions; use of judgment; and, responding appropriately to supervision, co-workers, and usual work situations including changes in the routine work setting.  20 C.F.R. § 404.1521(b).  Though the ALJ fulfilled his duty and was substantially supported in his assessment of only mild restrictions in broad areas of mental function including activities of daily living, social functioning, and concentration, persistence or pace, the regulations  recognize that a finding of nonseverity continues to depend upon the level of limitation on the basic work activities identified in § 404.1521(b) being no more than "minimal."  20 C.F.R. § 404.1520a(c), (d)(1).  In keeping with this minimalist view of regulatory "severity," the Sixth Circuit has liberally construed this standard in favor of claimants.  Griffeth v. Comm'r of Soc. Sec., 217 Fed.Appx. 425, 428 (6th Cir. Feb. 9, 2007).

domains was found by the ALJ to "not preclude the ability to perform unskilled, entry level work activity." (Tr. 31) This functional limitation to unskilled, entry-level work should have been made explicit in the ALJ's questioning of the vocational expert, but was not; instead, the ALJ merely advised of plaintiff's educational level, including her limited reading, writing, and math skills, and instructed the expert "to assume that there are no mental health related limitations." (Tr. 803) This was insufficient. All credible limitations resulting from a claimant's impairments must be included in the ALJ's hypothetical to the vocational expert, in order for the resulting expert testimony to be reliable. E.g., Webb v. Comm'r of Soc. Sec., 368 F.3d 629, 633 (6th Cir. 2004). Even had the vocational expert answered the ALJ's hypothetical here by identifying only unskilled jobs, in keeping with the implicit requirement of unskilled work for a person with a limited or marginal education and no transferable skills, it would not render harmless the ALJ's failure to include all substantially supported limitations in his hypothetical to the expert, particularly since the expert was also specifically instructed to assume no mental health related limitations. Pickney v. Chater, 96 F.3d 294 (8th Cir. 1996); cf. also Potter v. Comm'r of Soc. Sec., 223 Fed.Appx. 458, 462-63 (6th Cir. May 8, 2007)(holding paramount the consideration of "the degree to which [claimant's] current mental impairments prevent her from functioning in a work environment," as distinguished from her level of education). For this reason too, reconsideration of the vocational issues in this case is warranted.

Finally, plaintiff argues that it was error for the ALJ to give "significant weight" to the assessment of consultative examiner Dr. Davis, and then fail to include all limitations assessed by that examiner in the finding of plaintiff's residual functional capacity.

(Specifically, the ALJ did not credit Dr. Davis's assessment that plaintiff could only occasionally climb, balance, kneel, crouch, and stoop, could never crawl, and had environmental limitations related to temperature extremes, humidity, wetness, noise, vibration, and hazards such as machinery and heights. (Tr. 613-14)) Plaintiff cites Social Security Ruling 96-5p in support of this argument. That ruling does state that ALJs should be mindful of the potential need to parse the assessments of medical sources if limitations in some functional areas are credible while others are not, and further that ALJs are to "provid[e] appropriate explanations for accepting or rejecting such opinions." 1996 WL 374183, at *4-5. However, the ruling emphasizes the differing standards applicable to analysis and decision-writing when the subject of scrutiny is a treating source assessment, versus when the subject assessment is from a nontreating source, and the heightened requirements ascribed to the former. In this case, the ALJ also gave "significant weight" to the assessment of treating physician Dr. Thati, who certified to the Tennessee Department of Human Services that plaintiff was capable of providing child care in that she could lift forty pounds, and had the stamina and agility to keep pace with toddlers (Tr. 31, 588). The ALJ discussed both the assessment of Dr. Thati and that of Dr. Davis in detail (Tr. 25, 27), and resolved the inconsistencies between them in fashioning his RFC finding. While the explication of that process was perhaps not ideal, it is clear that the ALJ gave due consideration to the evidence from both physicians. The undersigned cannot find reversible error in the ALJ's failure to specifically delineate his reasoning with respect to certain postural and environmental limitations assessed by Dr. Davis, a government consultant who examined plaintiff on only one occasion.

25

In sum, the vocational issues discussed herein reveal a lack of substantial evidence supporting defendant's step five determination that plaintiff could perform a significant number of other jobs in the economy. The undersigned thus concludes that remand is in order for further proceedings consistent with this report, to include rehearing.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **GRANTED**, and that defendant's decision be **REVERSED** and the cause **REMANDED** for further administrative proceedings consistent with this report, to include rehearing.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 5th day of January, 2009.

s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE